## BEALMEAR v. HUTCHINS et al.

(Circuit Court of Appeals, Fourth Circuit. November 8, 1906.)

### No. 580.

1. PUBLIC LANDS—CHEROKEE LANDS OF NORTH CAROLINA—MANNER OF PRIVATE ENTRY.

Pub. Laws N. C. 1835, p. 7, c. 6, as amended by Pub. Laws 1836-37, p. 29, c. 7, relating to Cherokee Indian lands, and carried into 1 Rev. St. N. C. 1837, c. 42, §§ 1, 36, made all vacant and unsurveyed lands west of the Meigs and Freeman line of 1802, which had been acquired by the state from the Cherokee Indians by the treaties of 1817 and 1819, subject to entry and grant under the general entry and grant laws of the state, and a grant of lands within said territory from the state, issued pursuant to such authority, and regular on its face, is presumptively of lands which were vacant and unsurveyed, and valid, and cannot be collaterally attacked. Such a grant is sufficient, prima facie, to support an action of ejectment.

2. SAME—VALIDITY OF GRANT.

A grant of land from the state, based on a prior entry, and issued on the payment of the purchase price in accordance with said entry, is not affected by a law enacted between the date of the entry and the issuance of the grant.

3. EVIDENCE—RULING ON ADMISSIBILITY OF DEED.

In passing upon the admissibility of state grants or deeds offered as evidence by plaintiff in ejectment as the foundation of his title, the only question is as to the competency of the instruments, and an objection to the same will not be sustained unless the probate is defective.

4. EJECTMENT.

The rulings of the court, in excluding evidence offered by a plaintiff in ejectment to prove title, considered, and *held* erroneous.

5. PUBLIC LANDS—NORTH CAROLINA—CREATION OF NEW COUNTY—COMPLETION OF ORGANIZATION.

Jackson county, N. C., was created by Pub. Laws 1850-51, p. 97, c. 38, from territory of Macon and Haywood counties, but by chapter 39 (page 99), passed on the same day, it was provided that the officers of the old counties should continue to exercise jurisdiction over the territory cut off from their respective counties as before, and there was no provision for the permanent organization of Jackson county until the enactment of chapter 44, p. 97, Laws 1852, under which such organization was made in 1853. *Held*, that until such time Jackson county had no legal existence, and that an entry in 1852 of public land situated in that part of Jackson county taken from Macon county was properly made before the entry taken of Macon county.

148 F.—35

In Error to the Circuit Court of the United States for the Western District of North Carolina, at Asheville.

For opinion below, see 134 Fed. 257.

Geo. H. Smathers (F. A. Sondley, on the brief), for plaintiff in error.

James H. Merrimon, for defendants in error.

Before GOFF and PRITCHARD, Circuit Judges, and PURNELL, District Judge.

PRITCHARD, Circuit Judge. This is an action of ejectment brought by the plaintiff in error against the defendant below Thomas Hutchins, in the superior court of Swain county, N. C., on the 16th of October, 1899, to recover of the defendant the possession of two tracts of land of 640 acres each, situate and lying in Swain county. The defendant the Whittier Lumber Company was, by an order of the presiding judge of the superior court of Swain county, permitted to become a party and defend the title to the said two tracts of land as the landlord of the defendant Hutchins. Upon a petition filed by the defendant Whittier Lumber Company on June 14, 1900, the case was removed from the superior court of Swain county to the Circuit Court of the United States at Asheville. The case was tried at the November term, 1904, of the Circuit Court, and the following issues submitted: (1) Is the plaintiff the owner in fee simple, as alleged in his complaint, of the land described therein and entitled to the possession thereof? (2) Is the defendant in the wrongful possession thereof as alleged in the complaint? (3) What damages is the plaintiff entitled to recover?

The plaintiff offered in evidence state grant No. 16 and patented by the state to J. L. Moore on January 5, 1854. Counsel for defendants in error objected to the introduction of this grant for the following reasons: First, that the land embraced in said grant was not subject to entry under the laws of North Carolina, on the date the same purported to have been entered, the 26th day of July, 1852, and that the said grant obtained thereon was for that reason void; second, that said land appeared from said survey to have been entered before the entry taker of Macon county, after the county of Jackson had been created by the General Assembly of North Carolina, and that such entry was not authorized by the laws of North Carolina and had not been cured by any subsequent legislation enacted by the state of North Carolina, and that said grant was for that reason void.

At this stage of the trial, and in connection with the objections made by the attorneys for the defendants to the introduction of said grant in evidence, in order to present the point as to the validity of the said grant, and another grant, being grant No. 18, issued and patented to J. L. Moore by the state of North Carolina, adjoining grant No. 16, entered, surveyed, and granted on the same date, and of the same character, the plaintiff's attorney admitted that the said grants were the sole basis of plaintiff's title to the said two tracts of land, and thereupon in open court, and in the presence of the court and jury, the fol-

lowing agreements and admissions were made by Geo. H. Smathers, attorney for the plaintiff, and Jas. H. Merrimon, of the law firm of Merrimon & Merrimon, attorney for defendants, as to the facts: First, that the two tracts of land described in plaintiff's complaint, and sought to be recovered in this action, lie west of the Meigs and Freeman line, and within the territory acquired from the Cherokee Indians by treaties made and concluded between the United States and the Cherokee Nation or Tribe of Indians, in the year 1817, and 1819, and that said tracts of land are a portion of what are known as "Cherokee Lands"; second, that the said lands are a part of the territory taken from Macon county by the act of the General Assembly of North Carolina, ratified the 29th day of January, 1851 (Pub. Laws N. C. 1850–51, p. 97, c. 38), establishing the new county of Jackson, and are located within the boundaries prescribed by the General Assembly under that act for the said new county; third, that at the dates of the entries of the said two tracts of land, by J. L. Moore on the 26th day of July, 1852, and also at the date of said grants by the state of North Carolina on the 5th day of January, 1854, to J. L. Moore, the said lands were located within the boundaries prescribed by the legislation establishing the new county of Jackson; fourth, that, since the entries and grants of said two tracts of land to J. L. Moore, another new county has been established by the legislation of North Carolina, called Swain county, and the said two tracts of land were at the commencement of this action and are now in Swain county; fifth, that the several treaties between the United States and the Cherokee Indians pertaining to the Cherokee lands in North Carolina should appear in the facts, and also all legislation, general or special, by the state of North Carolina pertaining to the said Cherokee lands, or their entry and grant, and also the act of January 29, 1851, establishing the county of Jackson, together with general or special acts pertaining to the said county, should constitute part of the facts in this case—these to be read from the books and records; sixth, in this connection the plaintiff offered in evidence grant No. 18, issued and patented by the state of North Carolina to J. L. Moore on January 5, 1854, covering the other tract of land described in plaintiff's complaint, which it was admitted by the plaintiff was entered on the same date upon a similar survey, and under the same circumstances as grant No. 16 (Exhibit A) aforesaid, and same objections were made by the counsel for the defendants to the introduction of said grant in evidence as that made to grant No. 16 (Exhibit A) aforesaid. Upon the foregoing admissions and agreed state of facts, and after a full discussion of the matter by the counsel for both plaintiff and defendants, the court sustained the objections of defendants and refused to admit the grants in evidence and declared the same to be void.

The plaintiff next offered to prove that these grants were duly recorded in Jackson county within the time required by law, and offered to introduce in evidence the deeds and a certified copy of a will constituting the plaintiff's (H. Bealmear's) muniment of title to said two tracts of land, grants Nos. 16 and 18 aforesaid, and prove the location of the same, and that said deeds had been recorded in the proper counties, and that said will had been duly proven, probated, and recorded,

etc., in the manner provided by the laws of North Carolina, whereupon the court asked counsel for the plaintiff if the deeds and copy of will aforesaid were offered in evidence with a view of showing any other title than that derived through grants Nos. 16 and 18 aforesaid, or an actual possession of the said two tracts of land under any of said deeds as color of title, to which the counsel for plaintiff replied, "No," but offered to introduce the same with the view of showing the plaintiff's chain of title to the tracts of land in controversy, and admitted that he relied solely on the validity of the grants and chain of title to show title in plaintiff to said tracts of land. Counsel for the defendants, without examining the deeds and certified copy of will, and without even admitting that they passed such title as they purported to convey, objected to the introduction of the same in evidence upon the ground that the grants aforesaid had been declared by the court to be void, and that said evidence was immaterial. This objection was sustained by the court. No evidence whatever was offered by the defendants. The court then directed the jury to answer the issues in favor of the defendants.

The merits of this controversy have been ably presented by counsel representing the respective parties. The General Assembly of North Carolina at its session of 1789 passed an act reserving to the Cherokee Indians a vast territory of country, which is now known as "Western North Carolina" and "Eastern Tennessee." The portion of this territory embraced in Western Carolina was at that date known as "Cherokee lands." By the fifth section of an act passed by the General Assembly of North Carolina in 1783, entitled "An act for opening the land office for the redemption of specie and other certificates," etc., the following reservation was made for the use of the Cherokee Indians, to wit:

"That the Cherokee Indians shall have and enjoy all of that tract of land bounded as follows: Beginning on Tennessee where the southern boundary of this state intersects the same nearest Chickamauga towns, thence up the middle of the Tennessee and Holston to the middle of the French Broad, thence up the middle of the French Broad river (which lands are not to include any island or islands in said river) to the mouth of big Pigeon river, thence up the same to the head thereof, thence along the dividing ridge between the waters of the Pigeon river and the Tuckasejah river to the southern boundary of this state; and the lands contained within the aforesaid bounds shall be and are hereby reserved unto the said Cherokee Indians and their nation forever; and anything herein to the contrary notwithstanding."

Section 6 of said act reads as follows:

"That no person shall enter and survey any lands within the bounds set apart for the said Cherokee Indians, under a penalty of fifty pounds specie for every such entry so made to be recovered in any court of law in this state by and for the use of any person who shall sue for the same and all such entries and grants thereupon, if any should be made shall be utterly void."

The Legislature of North Carolina, at its session of 1789, passed an act ceding or authorizing the cession of the section of country comprising the state of Tennessee to the United States, and the deed of cession was made February 25, 1790. By the adoption of the Constitution of the United States the several states surrendered their power to make treaties with the various Indian tribes. Subsection 3 of sec-

tion 8, and also section 10, of article 1 of the Constitution of the United States. Therefore, after the adoption of the Constitution, all treaties with Indians had to be made with the United States. Nevertheless, when a treaty was made which had for its object the extinguishment of the title of the Indians or their right of occupancy to the land within the original 13 states, the land reverted to and became a part of the public domain of the states.

Among other things, our attention has been called to a number of treaties entered into from time to time by the United States with the Indians who originally occupied the territory known as "Western North Carolina." Without undertaking to enter into details as to when and where these treaties were made, or as to the amount of territory affected by the respective treaties, we will content ourselves by saying that the Indians from time to time disposed of their lands by treaty and were finally divested of the remaining portion east of the ceded territory (that is to say, the boundary line between North Carolina and Tennessee) by the New Echota Treaty entered into by the Indians with the United States at New Echota, Ga., on the 29th of December, 1835. By the adoption of this treaty the state of North Carolina became reinvested with title to all the lands in said territory. This treaty contained a reservation to the effect that a certain class of individual Indians might have the right to remain east on the terms and conditions named, and that they should be entitled to a "pre-emption right to 160 acres of land at the minimum Congress price to include their improvements." This was the last treaty made between the United States and the Cherokee Indians before they moved west. These Indians were commonly known as "Eastern Cherokees," and those who had emigrated to the west prior to that time were known as "Western Cherokees."

The Legislature, at its session of 1819, passed an act in regard to the disposition of the Indian lands that had been acquired by treaty, the first, second, third, fourth, fifth, sixth, seventh, eighth, and tenth sections of which are as follows:

"1. That as soon as may be convenient after the passage of this act, the Governor shall appoint two commissioners whose duty it shall be to superintend and direct the manner in which the said lands shall be surveyed and laid off into sections containing from fifty to three hundred acres of land; that they shall further cause the principal surveyor to note down in each of said sections the quality of the land contained therein, stating that it is of the first, second or third quality; and in all cases where it can be done with convenience, or the situation of the land will admit of it, such portion of the adjoining mountainous lands shall be included in each section as may be deemed sufficient for buildings, fences, fuel and other necessary improvements.

"2. That one principal surveyor of skill and integrity, shall also be appointed by the Governor, with full power and authority to appoint as many deputy surveyors, chain carriers and markers, and to employ as many pack horses as may be thought necessary to complete the said survey in the most speedy and effectual manner; for whose conduct the said principal surveyor shall give bond and security in the sum of ten thousand dollars payable to the Governor for the time being, for the faithful discharge of the several duties imposed by this act. It shall further be the duty of the said principal surveyor, under the directions of the commissioners aforesaid, to cause each section by him surveyed to be measured and marked, the corners to be clearly designated on trees, or otherwise, with the number of each section.

"3. That each surveyor shall note in his field book the true situation of all mines, springs, mill seats and water courses, over which the lines he

runs shall pass, and those contiguous thereto; that the said field book shall be returned to the commissioners, who shall cause their principal surveyor therefrom to make a description of the whole lands surveyed, in three connected plats, one of which, when completed, shall be transmitted to his excellency, the Governor, one to the secretary's office, and the other lodged and recorded in the clerk's office of the county of Haywood.

"4. That it shall be further the duty of the said commissioners to ascertain and fix upon some central and eligible spot for the erection of the necessary public buildings, whenever that section of the state may be erected into a separate county, and that four hundred acres surrounding said site shall be reserved for the future disposition of the legislature.

"5. That no portion of said lands shall be surveyed and laid off into sections, except so much thereof as in the estimation of said commissioners will sell for fifty cents per acre; and that the residue of said lands shall be reserved for the future disposition of the legislature, and that no part or portion thereof shall be liable to be entered in the entry-taker's books for the county of Haywood, or elsewhere, until provision be made by law for the disposal thereof; and entries heretofore made, or grants obtained or which may hereafter be made, otherwise than as provided by this act, be and the same are hereby declared to be utterly void and of none effect.

"6. That the Governor, on receipt of the plats and drafts heretofore provided for in this act, shall give notice by proclamation in all the newspapers published in the city of Raleigh and in such other papers in the adjoining states of South Carolina, Georgia, Virginia and Tennessee, of the time and place of sale, as he may deem advisable which in no case shall be less than two months from the date of the notice, that the said lands shall be exposed at public sale to the highest bidder at Waynesville, in the county of Haywood, under the superintendance of the said commissioners; and the sale shall be kept open for the space of two weeks and no longer.

"7. That the said commissioners shall require of each and every purchaser to pay down, at the time of sale, one eighth part of the purchase money, and shall take bond and security for the payment of the balance in the following installments, viz.: the balance of one fourth at the expiration of twelve months, one fourth at the expiration of two years, one fourth at the end of three years and the remaining fourth at the end of four years; in no instance shall a grant or grants issue to the purchaser, until the whole of the purchase money be paid in full; and in case of failure to pay the whole when due, and the money cannot be obtained by a judgment on their bond, then and in that case, the land shall revert to the state, and be liable again to be sold for the use and benefit of the state.

"8. That if during the time of said sale, any section of land noted to be of the first quality, shall not command in the market the sum of four dollars per acre, the said commissioners shall postpone the sale of such section until further directed by the legislature; and in like manner lands of the second quality not commanding three dollars, and lands of the third quality not commanding two dollars shall be postponed as aforesaid, and report thereof made to the Governor."

"10. That the said commissioners shall give to each purchaser a certificate describing the land by him purchased, with a plat of the lot and number of the section conformable to the plan returned to the secretary's office; upon the production of which proof of the payment of the purchase money made to the secretary by the treasurer's receipt, it shall be the duty of the said secretary to issue a grant to the purchaser for the said lot of land in the usual and common form."

The other sections of the act are not material to this controversy. There were from time to time supplemental acts passed bearing upon this subject, but such acts related principally to the price and terms upon which the lands should be sold, but did not change any of the material provisions of the act of 1819. It is well to bear in mind the provisions of this act, inasmuch as the same have been the cause of much litigation, and the courts have at times been perplexed in consequence

thereof when called upon to construe the different statutes relating to entries and grants pertaining to lands lying within the territory in question.

The lands referred to in the foregoing act which had been acquired by the treaty of 1819 and authorized to be surveyed and sold by the commissioners in accordance with the provisions of the act of the Legislature of 1819, and the several acts supplemental thereto, were surveyed and sold from time to time until the year 1835, at which time it must have been apparent to the Legislature that all of the lands that would sell for a price greater than the other vacant lands of the state then subject to entry and grant had been surveyed, and accordingly it was provided that the vacant and unsurveyed lands acquired in 1817–19 by treaty from the Cherokee Indians should be subject to entry and grant in accordance with the general entry and grant law of the state. The act in question is as follows (chapter 6, p. 7, Pub. Laws 1835) :

"That from and after the first day of May next, it shall and may be lawful for any person or persons to enter any vacant and unsurveyed lands that have been acquired by treaty from the Cherokee Indians in the year of one thousand eight hundred and seventeen and one thousand eight hundred and nineteen under the same rules, regulations, and restrictions, that are already provided by law for entering vacant lands in this state, and all laws and clauses of laws coming within the meaning, and purview of this act, be and the same are hereby repealed."

This act was amended by chapter 7, p. 29, Pub. Laws 1836–37, entitled "Cherokee Lands," and reads as follows:

"That nothing in the aforesaid act contained shall be so construed as to authorize or allow the entry of any portion of the said lands, which were reserved or allotted to any Indian or Indians under said treaties, which the state has since acquired by purchase; and that the secretary of state be, and he is hereby directed to issue no grant for any portion of the lands of the latter description, until the General Assembly shall otherwise order and direct."

The lands referred to in the last-mentioned act are those that were reserved to the individual Indians by the second and third sections or articles of the treaties of 1819 and purchased by the state from said Indians as shown by the act of the General Assembly in the years 1823–24.

The acts of 1835 and those amendatory thereof (chapter 7, p. 29, Laws 1836–37), were brought forward and re-enacted in the first volume of the Revised Statutes of North Carolina, chapter 42, entitled "Entries and Grants"; the former act being re-enacted in section 1, and the latter in section 36 of said chapter. The first section of this chapter is as follows:

"That all vacant and unappropriated lands belonging to this state shall be subject to entry in the manner herein provided, except in the cases hereinafter mentioned. It shall not be lawful for any entry-taker to receive an entry for any lands lying to the westward of the line run by Meigs and Freeman in the year one thousand eight hundred and two, as the then boundary line between this state and the Cherokee Nation, except the vacant and unsurveyed lands that have been acquired by treaty in the years one thousand eight hundred and seventeen and one thousand eight hundred and nineteen; or any lands covered by the waters of any of the lakes of the state, or any lands now covered by the waters of a lake that shall be gained therefrom by the

recession, draining or diminution of such waters; and every entry made and grant issued contrary to the intent and meaning of this enactment shall be void."

The record in this case is somewhat complicated, owing to the fact that, after the jury had been impaneled and the issues submitted, and the grants upon which the plaintiff relies had been rejected by the court as incompetent evidence, it appears that an agreement was entered into between counsel for the plaintiff in error and the defendants in error, which was treated as an agreed statement of facts, upon which the court below held: First, that grants Nos. 16 and 18 were void because under the laws of North Carolina the lands embraced therein were not subject to entry and grant at the time they were issued; second, that these grants were void because the same were entered in the county of Macon July 26, 1852, after the county of Jackson had been created.

The first question that we are called upon to decide is whether any of the vacant and unsurveyed lands west of the Meigs and Freeman line were subject to entry and grant under the general entry and grant laws of the state at the date of the entries upon which these grants were based. As we have already said, the act of 1835, as amended by the act of 1837, was brought forward and incorporated in the Revised Statutes of 1837, and was in full force and effect on the 26th day of July, 1852, at the time the entries were made in pursuance of which the grants in question were issued. This act contains general authority for the entry and grant of all vacant and unsurveyed lands west of the Meigs and Freeman line which had been acquired by treaty in 1817–19. It clearly indicates that it was the purpose of the Legislature of 1835 that all vacant and unsurveyed lands which had not been surveyed in accordance with the act of 1819 and acts supplemental thereto should be subject to entry and grant. The reference contained therein to the "vacant" and "unsurveyed" lands is not susceptible of any other interpretation. The act of 1835, being general in its terms, must be construed as authority for the entry and grant of any and all vacant and unsurveyed lands within any of the counties to which it refers.

It was evidently the purpose of the Legislature to exempt from the operation of the general law which it enacted at that time all lands that had been surveyed as Indian lands; the statute authorizing which, as we have heretofore said, provided specific and particular means for the entry and grant of certain grades of lands known as "Cherokee Indian" lands of that territory. In framing the act of 1835, it would have been an easy matter to have provided that none of the lands west of the Meigs and Freeman line should be subject to entry and grant, and this is precisely what would have been done had it been the purpose of the framers of the act to exempt all of the lands west of this line from the operation of the general entry and grant law at that time. The fact that the act of 1835 expressly refers to the vacant and unsurveyed lands west of the Meigs and Freeman line shows most conclusively that there were vacant and unsurveyed lands west of this line at that time, and that it was the purpose of the Legislature to provide for the entry and grant of all such lands in that territory which

had not been surveyed prior to that date in accordance with the provisions of the act of 1819, and subsequent acts relating thereto. Prior to that date the state had disposed of the lands west of the Meigs and Freeman line in accordance with the provisions of the act of 1819, under the operations of which the more valuable class of lands that had been acquired by the various treaties from the Indians were entered and granted to individuals residing in that territory.

It should be borne in mind that the act of 1835 expressly authorized the entry and grant of all vacant and unsurveyed lands that had been acquired by the treaties of 1817 and 1819. It contained no exception whatever, and the fact that the Legislature at its session of 1836 and 1837 amended the act of 1835, so as to prohibit the entry of "any portion of the said lands which were reserved or allotted to any Indian or Indians under said treaties, which the state had since acquired by purchase," clearly indicates that the Legislature of that session construed the act of 1835 to mean that all the vacant and unsurveyed lands that had been acquired by the treaties of 1817 and 1819 west of the Meigs and Freeman line were subject to the general entry and grant laws of the state. It is obvious that the Legislature of 1835 carefully considered all questions relating to the lands that lay west of the Meigs and Freeman line and reached the conclusion that the vacant and unsurveyed lands west of that line that had been acquired by the treaties of 1817 and 1819 should be placed on the same footing as the other vacant lands in the state. Therefore, when the act of 1835 was passed, the vacant and unsurveyed lands within that territory were made subject to entry and grant and were treated in the same manner as other vacant lands in the state that were subject to entry and grant. Suppose the grants in question had been issued for lands outside of the territory embracing the Indian lands, would it be seriously contended that the same could be attacked collaterally in an action of ejectment, upon the ground that such grants did not indicate that the lands granted belonged to the vacant and unappropriated class? Such a proposition would hardly be advanced in any court, and it is equally as unreasonable to insist that grants for vacant and unsurveyed lands west of the Meigs and Freeman line should show that such lands were vacant and unsurveyed in order to render the same valid. The state authorized the entry and grant of vacant and unsurveyed lands west of the Meigs and Freeman line, and in pursuance thereof the entries were made, the lands surveyed, the state received the price agreed upon in payment therefor and issued grants for the same. The natural and reasonable presumption which arises is that the grants were issued in pursuance and in accordance with the provisions of the general entry and grant law authorizing the same.

Under these circumstances, did the court err in undertaking to pass upon the legal sufficiency of the grants in question? These grants are regular and in the usual form and purport to convey title to certain lands within the state and to have been issued by the state, and being thus issued under a general authority and containing the terms usually employed, cannot be attacked collaterally. The only method by which the validity of the grants could be attacked would be in an action in-

stituted for the purpose of having the same vacated. Such is not the case at bar. "A grant for land lying in a county to which the entry laws apply cannot be attacked collaterally for fraud or mistake in procuring such grant." Holly v. Smith, 130 N. C. 85, 40 S. E. 847.

The defendants in error rely on the case of Stanmire v. Powell, 35 N. C. 313, as authority to show that the two tracts in controversy are not subject to entry and grant under section 1, c. 42, of the Revised Statutes, or under the general entry and grant law of the state. In that case the plaintiff claimed the two tracts of land in controversy under a resolution of the General Assembly of North Carolina, passed on the 16th day of January, 1849, donating to Ailsey Medling 640 acres of land in one body or quarter section, in consideration of services rendered by her father, James Schoolfield, in the Revolutionary War. The resolution under which plaintiff claimed title was to the effect that the provisions of the same were to operate upon any of the lands of the state then subject to entry, and that the warrant or warrants to be issued therefor should be laid so as to include lands belonging to the state for which the state was not bound for title. The defendant claimed title to the land in controversy under the land sales of 1838, made in pursuance of chapter 9, p. 30, Pub. Laws 1836–37, entitled "An act prescribing the mode of surveying the lands of this state lately acquired by treaty with the Cherokee Indians," and produced a certificate from the commissioners, Samuel F. Patterson and Chas. L. Hinton, showing that he had purchased the lands at the sale of the Cherokee lands on the 2d day of November, 1838. The fourth section of this act (chapter 9, p. 32, Laws 1836–37) prohibited the entry and grant of all lands conveyed by the provisions of that act. This chapter applied to all the lands acquired from the Indians by the treaty of 1835 and included all the lands in Cherokee county. It provided the only manner by which any one could acquire title to lands in that county. At that time there was no entry taker in the county of Cherokee, and the entry upon which the grant was based was made before the clerk of the county court of Cherokee, under the resolution to which we have heretofore referred. The court held that the grant in that case was void: First, on the ground that there was no land in the county of Cherokee which was subject to entry and grant; second, that the state was bound for title to the land in controversy to the defendant under the purchase which he had made at the land sale of 1838.

In the case of Harshaw v. Taylor, 48 N. C. 513, the plaintiff claimed title to the lands under a grant issued by the state on February 18, 1852. At that time the land in Cherokee county was not subject to entry and grant; the act authorizing the same being ratified December 27, 1852. The defendant's claim in that instance was based upon a certificate of purchase issued to him by the land commissioners at the sale of 1838. The court held that the statute under which the plaintiff's grant was issued only authorized the entry and grant of unsold land, and that the land in controversy had been surveyed and sold in pursuance of the statute pertaining to the lands lying in Cherokee county, and the grant was issued before the act under which the plaintiff claims went into operation.

It will be observed that in both of these cases there was not only a statute (the terms of which were unqualified) containing a provision that none of the lands in the territory in which the lands in controversy were located should be subject to entry and grant under the general entry and grant laws of the state, but it also appears that the defendants' claim in each instance was based upon certificates of purchase issued to them by the land commissioners in pursuance of the act of 1819. In the cases mentioned there was indisputable evidence of the fact that the lands had been conveyed to the defendants under the provisions of the Indian land laws, but in the case at bar there is nothing to indicate what the defense will be in this respect, nor are the defendants under obligations to disclose what the nature of their defense will be until the plaintiff first presents to the court sufficient evidence to constitute a prima facie case. But in this connection we call attention to the fact that in each of these cases it was shown that the defendant acquired title by a certificate of purchase issued by the land commissioners at the land sales of 1838. We think that the evidence offered and proposed to be offered by the plaintiff in this case was sufficient to cast the burden upon the defendants to show any matters which they had to offer in the nature of a defense to the action, and it would be competent, among other things, if they could do so, to show that the lands described in the grants had been surveyed and sold to them or to those under whom they claim in accordance with the provisions of the laws relating to the disposition of what are known as the "Indian Lands." In this connection, it should be remembered that the act of 1835 was not passed upon in the consideration of the cases cited, nor has it ever been construed by the Supreme Court of North Carolina. Therefore this court will construe the same in accordance with the general rule of interpretation applicable in such cases.

It is insisted that the Cherokee lands were pledged in 1848 for the purpose of building the Western Turnpike Road. This is true, but the pledge was nothing more or less than a declaration on the part of the Legislature that the proceeds arising from the sale of these lands should be applied to the construction of the Western Turnpike. There is nothing in the act of 1848, which in any manner changes the method of disposing of what is known as the Cherokee lands, and the act can have no bearing upon the question involved in this controversy.

It is contended by the defendant that section 4, c. 9, p. 32, Laws 1836–37, which provides that "the residue of said lands shall remain subject to the disposition of a future Legislature and shall not be subject to be entered in the entry-taker's office of the county of Macon," repeals by implication the act of 1835, in so far as it related to the vacant and unsurveyed lands in the county of Macon. This act clearly does not apply to the lands that were acquired by the treaties of 1817–19, but relates solely to the lands that were acquired by the treaty of 1835 and were subsequently incorporated into what is known as "Cherokee County." The title of the act reads as follows: "An Act providing the mode of surveying and selling the lands of this state lately acquired by treaty from the Cherokee Indians." The language of the title makes two things clear, first, that the lands had lately been acquired by a

treaty, and not by treaties. If it had been intended that the provisions of the act should apply to all the vacant lands in Macon county, such lands would have been referred to as having been acquired by treaties, and not by treaty, as in this instance.

Also, section 16, c. 9, p. 37, of the act of 1836–37 provides as follows:

"That until the said section of country is laid off into a separate and distinct county it shall be and remain subject to the jurisdiction of the county of Macon and form a part thereof."

It is manifest that this provision means that the country referred to in this act had not been under the jurisdiction and control of Macon county prior to that date. It must be construed as referring to that section of country which had been recently acquired from the Cherokee Indians by the treaty of 1835. Under the circumstances the act of 1836–37 did not repeal by implication the act of 1835, inasmuch as there is nothing in the one which interferes with the provisions of the other. The county of Cherokee was created by the act of the Legislature of 1838–39, and the lands referred to by the act of 1836 were included within the territory comprising the new county and as such were not subject to entry and grant under the general entry and grant law of the state until 1852, at which time an act was passed authorizing the entry and grant of all vacant and unsold lands in Cherokee, Macon, and Haywood counties in accordance with the method therein provided, and this act continued in force until repealed by sections 2478, 2479, of the second volume of the Code, at which time all the Cherokee lands were subject to entry and grant under the general entry and grant law of the state.

It is also insisted by the defendants in error that the law on which the entries were based was changed subsequently to the dates of the entries and before the grants were issued. While this may be true, an act passed since the date of the entry could not affect the rights of the enterer as of the date when the entry was made.

The acts of 1854–55 (section 31, c. 18, p. 44, Pub. Laws) authorized the entry and grant of vacant and unappropriated lands belonging to the state subject to certain exceptions. Section 31 of this act is as follows:

"Nothing contained in this chapter shall apply to the lands commonly known as and called Cherokee lands but the said lands are to be disposed of and regulated according to the laws in relation thereto."

This provision of the law passed after the entry had been made upon which the grants in question were based cannot affect in the slightest degree any rights that may have been acquired by the enterer upon the payment to the state of the sum agreed upon as the purchase price of the land for which grants were issued. When Moore made the entry in 1852, he acquired an equity which was completed by the payment of the sum named therein and the issuance of the grants. The right which he acquired at the date of the entry to have the grants issued upon his compliance with the terms of the entry was not disturbed by any act of the Legislature passed after the date of the entry and prior to the issuance of the grant.

In the case of Bryson v. Dobson, 38 N. C. 140, the court held:

"The law allowed her until the 31st of December, 1844, to pay the purchase money, and, upon her doing so, it assured her she should have a grant upon application in due time. The entry, if not a contract with the state, strictly speaking, at least creates an inchoate valuable interest, sustained by statute and a guaranty of the public faith. That interest, if the enterer performs the condition imposed by law, no authority can justly take away or deny. * * *"

In Featherston v. Mills, 15 N. C. 596–598, it is declared that an entry "is in equity, which, upon payment of the purchase money, entitles the enterer to a grant, if applied for in due season; and also entitles him to call for a conveyance from one who has already obtained a grant for the same land, with notice of the previous entry. That such is the idea of the right by entry is clear from many circumstances."

In Plemmons v. Fore, 37 N. C. 312, it was held:

"An entry of land creates an equity, which, upon the payment of the purchase money to the state in due season, entitles the party to the grant, and consequently to a conveyance from another person who obtained a prior grant under a junior entry with knowledge of the first entry."

In Stanly v. Biddle, 57 N. C. 383, 384, it was held, in speaking of an entry:

"It is prior in time, and by subsequent payment of the purchase money in due time it gave the plaintiff a complete equity, against the state, and also against those claiming under her by subsequent entry."

The court was without power to pass upon the validity of the grants after they had been rejected as evidence. When the plaintiff below offered the grants in question, he was entitled to have the same considered as evidence in his behalf, unless the court was of opinion that for some reason they were not competent to be used as such. As we have already stated, the court declared that the grants in question were void, notwithstanding the fact that the same had already been held to be incompetent as evidence in the case. It appears from the record that the court ruled the grants out on objection as to their effect, and not as to their competency. We do not understand this to be the rule governing the introduction of evidence of this character. Ordinarily, when a grant or deed is offered in evidence, the only question which can be raised is whether the instrument offered has been duly registered. The record shows that the plaintiff in error proposed to show that the grants had been registered, but even this evidence, like the grants, was rejected by the court upon the ground that the same was incompetent. We confess that we are at a loss to know what valid objection could have been reasonably offered to the admission of this evidence.

In the case of Wilhelm v. Burleyson, 106 N. C. 386, 11 S. E. 592, in discussing this rule, the court, among other things, said:

"An objection to the introduction of a deed offered as evidence will not be sustained, as a rule, unless the probate is defective and the reading of it is resisted on that ground. Vickers v. Leigh, 104 N. C. 248–260, 10 S. E. 308; Cox v. Ward, 107 N. C. 507, 12 S. E. 379."

The court below, in passing upon the validity of these grants, used the following language:

"Again, the authority of the entry taker, in respect to the Cherokee lands, was special, and was confined to the vacant and unsurveyed lands, and his authority must be shown by the party asserting it. Harshaw v. Taylor, 48 N. C. 513. In Ross v. Duval, 13 Pet. (U. S.) near the bottom of page 61, 10 L. Ed. 51, it is said: 'The rule is well settled that, to avoid the statute, a party must show himself to be within its exception.' "

We do not understand that the rule to which the court referred applies in this case because the statute of 1835 as embodied in the Revised Statutes is general in its terms and apples to all vacant and unsurveyed lands, and the first exception contained therein is that it shall not apply to any of the lands lying westward of the line run by Meigs and Freeman in 1802 as the then boundary line between this state and the Cherokee Nation, except the vacant and unsurveyed lands which had been acquired by treaty in the years 1817 and 1819. The reference to the Cherokee lands is an exception to the general law, and, in order to leave no doubt as to the fact that the Legislature intended to subject the vacant and unsurveyed lands to entry and grant, it was expressly provided as a second exception that the vacant and unsurveyed lands west of the Meigs and Freeman line should be subject to entry and grant. Therefore, if this provision be an exception to the general entry and grant law, at most it can only be considered as an exception to an exception. Hence the rule announced by the court below does not apply. The effect of the exception contained in the Revised Statutes was to preserve the status of the Indian lands west of the Meigs and Freeman line not affected by the act of 1835; as well as that portion which had been acquired by the New Echota treaty. The vacant and unsurveyed lands west of the Meigs and Freeman line acquired by the treaties of 1817–19 having been made subject to entry and grant under the provisions of the general law by the act of 1835, it was evidently the purpose of those intrusted with the duty of compiling the Revised Statutes to preserve the act of 1835 in so far as it related to those lands, and, in order that there might be no doubt as to the effect of the exception in the Revised Statutes which related to the Indian lands west of the Meigs and Freeman line, a proviso or saving clause was coupled with the exception to the effect that the vacant and unsurveyed lands acquired by the treaties of 1817–19 were not to be included as a part of the exception, but were to remain subject to the general entry and grant law of the state, thus leaving the act of 1835, in so far as it related to the vacant and unsurveyed lands west of the Meigs and Freeman line acquired by the treaties of 1817–19 unimpaired. But let us assume that the plaintiff's rights depended upon an exception to the general statute in this case. If such were the case, he would certainly be entitled to show by competent evidence that the grants upon which he relies are for lands that are vacant and unsurveyed at the date of his entry. This the court below refused to permit him to do.

Beginning at the last paragraph on page 23 and continuing on page 24 of the record is found the following statement:

"Plaintiff next offered to prove that said two grants were duly recorded in Jackson county within the time required by law, and offered to introduce in evidence a certified copy of a will constituting the plaintiff Bealmear's

muniments of title to said two tracts of lands, grants Nos. 16 and 18 aforesaid, and to prove the location of the same, and that said deeds had been recorded in the proper county, and that said will had been duly proven, probated, and recorded," etc.

To this evidence the defendants in error objected upon the ground that the same was immaterial. The defendants' objection was sustained by the court below. If the ruling of the court to the effect that the plaintiff's rights are based upon an exception to the general statute had been proper, it would have been error to have refused to permit the grants and deeds to be introduced in evidence and thus deny the plaintiff the right to show the location of the lands in controversy.

We will now consider the third ground upon which the court decided that the grants in question were void, to wit: "That they were void because they were entered in the county of Macon, July 26, 1852, after the county of Jackson had been created." Jackson county was established by the act of the General Assembly of North Carolina, passed in 1850–51 (page 97, c. 38). This county was erected from portions of Haywood and Macon counties. At the same session of the Legislature and on the same day an act was passed (page 99, chapter 39) entitled "An act for the administration of public justice for the county of Jackson." This act provided, among other things:

"That the superior courts of law and equity, of common pleas and quarter sessions for the counties of Haywood and Macon respectively shall have the same jurisdiction in all matters pertaining to the administration of public justice within the county of Jackson as said courts heretofore had and exercised therein."

It was further provided that the justices of the peace, constables, and other public officers theretofore appointed in Macon county, but living in the territory of Jackson county, should have and exercise the same powers and privileges and be subject to the same penalties as prior to that date. It was also provided that the sheriffs of Haywood and Macon counties should have power to execute process directed to them in the territory of Jackson county under the same rules and regulations, etc., as before the passage of the act establishing the county of Jackson. There was no provision for the permanent organization of the new county of Jackson until the session of the Legislature of 1852, at which time, on the 27th of December, 1852, an act was passed entitled "An act to provide for the holding of the county and superior courts of the Seventh judicial district." Laws 1852, p. 97, c. 44. Under this act the time was fixed, and also the place, for holding the county and superior courts of Jackson county. We quote so much of the first and second sections of this act as relate to the time of holding courts and all of the third section relating to the courts in Jackson county:

"Section 1. Be it enacted * * * that the county courts of the county of Jackson shall be held in March, June, September, and December of each and every year."

"Sec. 2. Be it further enacted that the superior courts of law and equity for the county of Jackson shall be held on the third Monday of March and September of every year. * * *

"Sec. 3. Be it further enacted that the first county court of the county of Jackson shall be held at the dwelling house of Daniel Bryson, Sr., and there-

after, until the courthouse is built, at such places as the county court (a majority of the justices being present) shall direct and after the courthouse is built the courts shall be held in such courthouse and the superior courts shall be held at the same place as the county courts."

It will be seen that the county of Jackson had no legal existence for any practical purposes until after its organization, which was not consummated until the March term, of 1853, of the county court or the court of common pleas and quarter sessions of that county. A careful reading of the laws of the General Assembly shows that the Legislature, at its session of 1852, did not consider that Jackson county had any legal existence, inasmuch as the legislation which was enacted at that session provided for the organization of the new county. While, on the other hand, all the laws enacted for Macon and Haywood counties were intended and did inure for the benefit of Jackson county, treating the territory taken from Macon and Haywood counties as being under the control and jurisdiction of the officials of Macon and Haywood counties. The third section of this act provided that the officers of Haywood and Macon counties should continue to exercise jurisdiction over the territory cut off from their respective counties, and it is fair to assume that they did continue to act until there was such an organization of the county as entitled it to be treated as a legal entity.

In Ryan v. Evans, 49 Tex. 364, the court held:

"That the fact that it was declared that 'a new county' within certain boundaries 'was established' did not have the effect to create a county, because in the same declaration it was contemplated and provided that certain things should be done in organizing it, which were necessary to be done in order to separate its territory from the jurisdiction of the two counties from which it was taken, and give it a distinct identity as a county, a body corporate constituting one of the civil and political divisions of the state."

In the case of Lumpkin v. Muncey, 66 Tex. 311, 17 S. W. 732, it was held:

"Until a new county is actually organized or attached to some other county, transfers of land located in it should be registered in the old county."

Under the head "When Organization is Perfected," 7 Am. & Eng. Ency. of Law (2d Ed.), the author says:

"A county completely organized has been held to signify a county having within itself the necessary means of performing its functions independent of any other county, with its lawful officers and machinery for carrying out the powers and performing the duties belonging to that class of corporate bodies."

Then again, on page 929, under the head, "On County Government," the author says:

"When a new county is created from the part of a territory of an old county, and provision is made for its organization at a future time, it remains attached to and under the government and control of the old county until its organization. But upon the organization of the new county the authority of the officers of the old county over the territory of the new ceases, and the administration of the affairs of the new county should be conducted only by its own officers."

Thus it will be seen that, where it is sought to create a new county, the territory thus taken from the old county will be treated for all purposes as being under the jurisdiction and control of the authorities of the old county, until there is a complete organization of the new county in compliance with the act authorizing the creation of the same. There are a number of cases in North Carolina wherein the question involved in this controversy has been passed upon.

In the case of Wyman v. Taylor, 124 N. C. 432, 32 S. E. 742, Chief Justice Furchees, in discussing this phase of the question, said:

"These lands were all in Macon county until the erection of the county of Swain. This was done by the General Assembly in February, 1871, but it was provided that the county government of Macon county should extend over the territory of the new county until it should elect its county officers, and they should be qualified and inducted into office in June, 1871. The entries, surveys, and plats for the Love land were all made before the time fixed for the organization of Swain county. Therefore the entries were made in Macon county, and the surveys and plats made by the surveyor of Macon county. This seems to have been proper, and the only place the entries could have been made, and the surveyor of Macon county was the proper officer to make the surveys and plats. The grant was not issued until the 2d day of May, 1872, but it was issued upon the entries, surveys, and plats in Macon county. This grant was registered in Macon county in 1873, but was not registered in the new county of Swain until 1879. It was not void, but good."

In the case of McMillan v. Gambill, 106 N. C. 359, 11 S. E. 273, the court held:

"The formation of the county of Ashe, in the year 1800, did not destroy the validity of an entry covering land within the boundaries of said county, but made in the entry taker's office of Wilkes county in 1798 and surveyed by virtue of a warrant issuing from said office in 1799; nor is a grant that issued for said land upon said survey and entry in January, 1801, void. The grant was admissible, and was sufficient, if located so as to include within its boundaries the disputed land (as to which there was no controversy), to show title out of the state." .

This case is cited with approval by Judge Furchees, in the case of Wyman v. Taylor, 124 N. C., 32 S. E.

It is insisted that, in the case of Harris v. Norman, 96 N. C. 59, 2 S. E. 72, the contention of the defendant is sustained. There is no analogy between that case and the one at bar. In that case the entry and survey were made in Wautauga county, and in pursuance thereof a grant was issued for the lands described as being in that county, but the evidence shows, as well as the admissions of the plaintiff, that the entire tract of land was located in Mitchell county. In that case the court properly held that the entry taker in Wautauga county was without authority to receive an entry for lands located in an adjacent county that were not subject to the laws and jurisdiction of Wautauga county. For the same reason the surveyor of Wautauga county was powerless to act in his official capacity in regard to land that lay in Mitchell county. In the case at bar the facts are entirely different. At the time the lands were entered the territory in which the same were embraced was subject to the jurisdiction and control of the officials of Macon county. Such being the case, the entry taker of that county is presumed to have acted within the scope of his authority. Under

148 F.—36

these circumstances, we think that the court below erred in declaring the grants void for the reasons hereinbefore stated.

It being provided that the officers of Macon county residing in the territory which had recently belonged to Macon county should have power and authority to act as public officials in that territory, and nothing else appearing, it is presumed that the entry taker resided in the territory formerly embracing a part of Macon county, and that he acted under the power and authority vested in him by the statute in question, and at most the action of the surveyor of Jackson county in surveying the lands in controversy in pursuance of the order of the entry taker of Macon county can only be said to be irregular, and, when we consider this phase of the question, section 2761 of the Code of North Carolina of 1883 is directly in point, and has been construed by the Supreme Court of that state.

Chief Justice Furchees, in the case of Wyman v. Taylor, 124 N. C. 424, 32 S. E. 741, says:

"And the state has accepted his survey made upon these several entries, taken its pay, and granted him the lands. It must therefore be supposed that the state considered his entries and his survey and plat a substantial compliance with the statute, or it must have considered this provision of the statute as only directory, and the entries, survey, and plat a substantial compliance with the statute. However this may be, they seem to us to be but irregularities that do not vitiate and avoid the grant. Such irregularities seem to be expressly provided for in section 2761 of the Code, and the grantee's title validated, if it were defective as contended by the defendants."

For the reasons hereinbefore stated, we are of opinion that the court erred, first, in refusing to admit the grants and will in evidence, together with the evidence as to the location of the land; second, in declaring the grants void upon the ground that none of the territory west of the Meigs and Freeman line was subject to entry and grant at the date of the entry upon which the grants in question were based; third, in declaring the grants void upon the ground that the land in question was entered in Macon county after the passage of the act authorizing the establishment of Jackson county.

The judgment of the Circuit Court is therefore reversed, and a new trial granted, with directions to proceed in accordance with the views herein expressed.

Reversed.